UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANA ROSA, | Civil Action No.: |
| Plaintiff, | **COMPLAINT** |
| -against- |  |
| NATUZZI AMERICAS, INC. & JASON CAMP, | **JURY TRIAL REQUESTED** |
| Defendants. |  |

Plaintiff Ana Rosa, by and through her counsel Carabba Law Firm P.C., as and for her Complaint against Natuzzi Americas, Inc. ("Natuzzi") and Jason Camp (collectively, "Defendants") alleges upon knowledge of her own acts and upon information and belief as to all other matters, as follows:

## NATURE OF CLAIM

1. Plaintiff brings this action in response to Defendants' unlawful interference with the exercise of her rights, and discrimination and retaliation against her for such exercise, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. (the "FMLA") and for associational disability discrimination and gender discrimination in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290, et seq., (the "Human Rights Law") and the New York City Administrative Code § 8-101, et seq., (the "City Law ") and for aiding and abetting perceived and actual discrimination in violation of the Human Rights Law and City Law.

2. Plaintiff seeks compensatory and punitive damages, liquidated damages, attorneys' fees and other appropriate relief pursuant to the FMLA, Human Rights Law and City Law. In

addition, Defendants violated the New York State Labor Law by failing to provide Plaintiff with the full information required by the Wage Theft Prevention Act, thereby entitling Plaintiff to additional damages.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Plaintiff's FMLA claims pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331.

4. This Court may assert supplemental jurisdiction over Plaintiff's state and city law claims as authorized by 28 U.S.C. § l367(a).

5. Venue is proper within this Judicial District pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred in the Southern District of New York.

## THE PARTIES

6. Plaintiff Ana Rosa ("Plaintiff") resides in New York County, New York and is a citizen of the United States. At all times relevant to the Complaint, Defendants employed Plaintiff in New York County, New York.

7. Upon information and belief, Defendant Natuzzi Americas, Inc. is a corporation organized and existing under the laws of the State of North Carolina and is authorized to do business in the State of New York. Upon information and belief, Natuzzi maintains its corporate offices at 130 West Commerce Avenue, High Point, North Carolina 27260.

8. Upon information and belief, Natuzzi is a wholly owned subsidiary of Natuzzi S.p.A., which claims to be "one of most renowned brands in the production and distribution of design and luxury furniture," with a global retail network of 703 mono-brand stores and 508 galleries as of December 31, 2022. It has been listed on the New York Stock Exchange since 1993.

9. Upon information and belief, Defendant Jason Camp ("Camp") is a resident of the State of California and at all times relevant to the Complaint was employed as President of Natuzzi Americas, Inc., reporting out of the Natuzzi headquarters in North Carolina.

10. At all times relevant to the Complaint, Plaintiff was an "eligible employee" of Defendants within the meaning of 29 U.S.C. § 2611(2) in that Plaintiff was employed by Defendants for more than twelve months prior to the events underlying this lawsuit; was employed by Defendants for at least 1,250 hours during the 12 month period immediately preceding the commencement of the leave which underlies this lawsuit; and Defendants employed more than 50 employees within a 75 mile radius of Plaintiff's "worksite" as defined under the FMLA and its governing regulations.

11. Plaintiff's father suffered from a serious health condition within the meaning of 29 U.S.C. § 2611 (11).

12. At all times relevant to the Complaint, Natuzzi was an employer within the meaning of 29 U.S.C. § 2611(4) in that it was engaged in an industry affecting interstate commerce and employed more than 50 employees for each working day during each of 20 or more calendar workweeks in the current and/or preceding calendar year.

13. At all times relevant to the Complaint, Defendants were employers within the meaning of Human Rights Law § 292(5), City Law § 8-102(5) and New York State Labor Law § 190(3).

14. At all times relevant to the Complaint, Defendant Camp was an employer within the meaning of 29 U.S.C. § 2611(4) in that he acted in Natuzzi's interest as against Plaintiff.

## STATEMENT OF FACTS

15. Plaintiff commenced employment with Natuzzi in November 2021 as the Showroom Manager for Natuzzi's Flagship store located at 105 Madison Avenue in New York City. In this role she reported to a District Manager and Vice President, who in turn reported to Camp.

16. Her work for Natuzzi was nothing short of remarkable. She took a woefully underperforming store and transformed it into a company leader.

17. Specifically, she: increased sales by developing and/or executing three successful sales and trade store events (interior design society/IDS, Aspire magazine, and Italy on Madison event with the Flatiron business association); developing and implementing a new selling process for the Madison sales team to engage new clients; creating a partnership with Madison House luxury condo building near the store location; optimizing store hours to maximize store traffic; and joining three industry business associations in New York City.

18. As a result of these and other efforts, she increased the trade business in the Madison Avenue store by 184% year over year, single-handedly equaling 30% of the store's total revenue for the year.

19. For October 2022, when she left the showroom manager position, her year to date sales were +105% to budget and +166% over the prior year.

20. In addition, she increased the average purchase ticket 72% over the prior year. The Madison Avenue store ended the year as the number one store in terms of percent over budget in the country. The prior year, the Madison Avenue store was dead last in the country.

21. Given her strong work performance and sales results, on or about December 4, 2022, Camp informed Plaintiff that she was selected to become Natuzzi's U.S. Trade Business Manager. This was a wholly new type of position for Natuzzi, created as part of a new initiative to generate sales outside of Natuzzi's specific stores.

22. The expectation was for Plaintiff to build a trade business from scratch, by curating relationships with interior design firms, architect firms and real estate firms 100 miles from any Company store and by working at trade shows/furniture markets and traveling within the United States to meet with clients. In this position, her salary was to be $110,000 base plus bonus.

23. She was to work remotely, reporting into Natuzzi's North Carolina headquarters and, in particular, Camp.

24. Given that Plaintiff was asked to take on a newly created position/endeavor, Camp expressly recognized that it would take significant time for her to ramp up and build sales. He gave her an annual sales goal of $490,000 to be met at the end of December 2023.

25. Camp made it clear that this would not be a short-term change with quick results, but one that would take significant time for Plaintiff to develop. As he wrote in March 2023, "we are building something from the ground up - which can take time." In fact, the design samples and selling tools needed for Plaintiff's position were not even scheduled to arrive until June 2023.

### *Plaintiff requested medical leave, is fired immediately in retaliation*

26. On May 25, 2023, Plaintiff informed Camp that her father was admitted to the hospital and she needed to take a day off to care for him.

27. On May 26, 2023, Plaintiff informed Camp that her father was diagnosed with stage 4 cancer, the matter was serious, and she would need to take additional days off/leave to care for him.

28. On June 2, 2023, Camp approved Plaintiff's time off and explained that Human Resources would send her forms to request leave under the Family and Medical Leave Act. At the same time, he told her that her sales goals would remain as they were for the remainder of the year.

29. On June 5, 2023, HR sent Plaintiff the FMLA leave request form for completion. Plaintiff completed and returned the documents on June 6, 2023, for leave to begin on June 9, 2023. The expected return date was July 21, 2023.

30. Putting Natuzzi's interests above her own, Plaintiff asked that her leave begin on June 9, rather than immediately as needed, so that she could complete a few current projects as well as to meet with a developer on June 6, 2023 to present a proposal for a new luxury building on 83rd and 2nd Avenue in New York City.

31. In any event, as was legally required by federal and state law, Plaintiff's leave request was approved.

32. By letter dated June 5, 2023, Plaintiff was abruptly fired, purportedly for shortfalls in the "2022 Quarter Four and 2023 Quarter One Budget." By the same letter, she was informed that her "Medical Benefits" would terminate on June 7, 2023, notwithstanding that her health insurance benefits were paid through the end of the month.

33. The alleged reason for Plaintiff's termination is clearly pretextual.

34. As an initial matter, it is significant that other than her three-month, initial performance review, Plaintiff did not receive any form of substantive performance review for 2022 or 2023 where any purported deficiencies could have been noted and addressed.

35. More importantly, at no time did she receive any indication that her job was in jeopardy or that she would be fired for failing to meet any sales expectations.

36. To the contrary, she was consistently told that the process would take time and that her overall sales would be evaluated in 2024, after the end of year results from 2023 could be reviewed.

37. Camp also told her that he would meet with her at the end of each quarter during the year to discuss her interim sales and how she was trending, yet he fired her before the end of the second quarter.

38. Nonetheless, at the time of her firing, Plaintiff was working towards the completion of various significant revenue generating projects.

39. Specifically, she was working on a large New York City project with a developer with an estimated sale of $142,000.

40. In addition, she was working with eight interior design and architect firms located in Arkansas, upstate New York, Maryland, Georgia, North Carolina, Long Island and Louisiana, for projects totaling approximately $160,000.

41. Indeed, had she not requested protected leave and been abruptly fired, her sales for the end of Q2 would have been $302,000 -- going a long way to meeting her year end target.

42. To add insult to injury, when Camp fired her, he explained that the Company would continue with the New York City developer project in her absence.

43. The Company's reliance on "budget shortfalls" in 2022 Q4 is remarkable, given that Plaintiff's store exceeded performance expectations for the quarter. Plaintiff should have been rewarded, not fired. Indeed, in March 2022, Natuzzi S.p.A Founder and Chairman Pasquale Natuzzi highlighted Plaintiff's successful performance in a global email to the entire organization and invited her to headquarters in Bari, Italy.

44. Moreover, none of the other Global Trade Business Managers were fired, only Plaintiff -- the only one to have taken leave and the only one singled out for "budget shortfalls." To Plaintiff's knowledge, no other employees were fired at or around the time of her firing. She is also not aware of any other firings since that time.

45. To the contrary, throughout 2023 Natuzzi was *expanding*, opening seven new stores in the United States, including a 10,000 square foot, flagship-type store in Manhasset, New York. Based on Plaintiff's stellar results in managing Natuzzi's New York City (before she was made Trade Business Manager), it defies business logic that she was not offered a position at any of those stores.

46. In fact, Natuzzi was/still is hiring for numerous positions, including Showroom manager for the Manhasset, New York store, Showroom Manager for the Kennesaw, Georgia store, Showroom Manager for the Miami, Florida store. Natuzzi is/was also hiring Design Consultants and Sales Representatives. The advertised Design Consultant positions, for both New York and Georgia, indicate a salary of up to $100,000 (plus commission), which is close to her final Natuzzi salary.

47. Moreover, soon after Plaintiff was fired, Camp announced on Natuzzi's 2023 Q2 earnings call that their average order was up approximately 20% year-over-year and that Natuzzi was committed to "*building a team* that can engage in more design project work . . . whether that's with our clients directly *or through trade partners*." (Emphasis added). For his part, Natuzzi's Chief Executive Officer Antonio Achille, on the 2023 Q3 earnings call, mentioned their "consistent" growth -- remarking that "the U.S. has shown more dynamism" in growth than other locations – and that the "long-term plan is to open around 8 to 10 stores per year in North America." All of this belies the alleged grounds for Plaintiff's firing.

48. Lastly, Plaintiff was fired just days after she ended a sexual relationship with a senior Natuzzi executive (the "Executive") who worked very closely with Camp and who was part of the senior leadership team.

49. The relationship began when the Executive propositioned her while they were on a business trip in April 2023. She chose to end their relationship on May 24, 2023. The Executive was unhappy, as he wanted the relationship to continue.

50. During a call to discuss her termination with Camp and HR on June 7, 2023, Plaintiff was told that the Executive was involved in the decision to fire her. Given his senior role with Natuzzi and Plaintiff's prior business dealings with him, she not only believed that he was

involved in her firing, but that he no longer wanted her employed since she just ended their relationship.

51. Plaintiff's firing constituted interference with, and retaliation against, her statutorily protected rights under the FMLA, the Human Rights Law and the City Law. Natuzzi retaliated against her for taking leave and, since she did not take her full leave allotment, they feared she would take additional leave due to her father's deteriorating medical condition. Natuzzi set Plaintiff's sales targets and demanded that she remain at work to meet them. Time off was not an option, even if statutorily protected.

52. Upon information and belief, Natuzzi did not have any postings in the workplace to apprise employees of their leave rights, nor does the Natuzzi handbook provide specific information about the rules, processes, procedures and/or statutory protections in relation to employee leaves, including but not limited to leave under the FMLA.

## FIRST CAUSE OF ACTION

### FMLA — Interference

53. Plaintiff realleges and incorporates by reference paragraphs 1 through 52 of the Complaint as if fully set forth herein.

54. By the aforementioned actions, Defendants, separately and together, have interfered with, restrained and denied Plaintiff her rights under the FMLA, in violation of 29 U.S.C. §§ 2612(a), 2614(a) and 2615(a).

55. As a result of Defendants' violation of the FMLA, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment and loss of opportunity for advancement and promotion.

## SECOND CAUSE OF ACTION

### FMLA — Retaliation

56. Plaintiff realleges and incorporates by reference paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57. By the aforementioned actions, Defendants, separately and together, have retaliated against Plaintiff for exercising her rights under the FMLA, in violation of 29 U.S.C. § 2615(a).

58. As a result of the retaliation engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment and loss of opportunity for advancement and promotion.

## THIRD CAUSE OF ACTION

### Disability Discrimination

59. Plaintiff realleges and incorporates by reference paragraphs l through 58 of the Complaint as if fully set forth herein.

60. At the time of her termination, Plaintiff's father suffered from a disability and/or Defendants regarded and/or perceived Plaintiff's father as disabled (as defined by Human Rights Law § 292(21) and City Law § 8-102)) by virtue of his cancer diagnosis as alleged above.

61. Defendants terminated Plaintiff because of her association with a disabled person and/or a person whom they perceived as having a disability.

62. Plaintiff was qualified to (and did) perform the essential functions of her position, with or without reasonable accommodation. By the aforementioned actions, Defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of her employment due to her known relationship or association with a disabled individual (her father) as defined under the Human Rights Law and City Law.

63. As a result of the discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

### FOURTH CAUSE OF ACTION

### Gender Discrimination

64. Plaintiff realleges and incorporates by reference paragraphs l through 63 of the Complaint as if fully set forth herein.

65. As described above, at the time of her abrupt termination, Plaintiff had just ended a relationship with the Executive and the Executive participated in the decision to fire Plaintiff. Plaintiff believes her decision to end the relationship was a motivating factor in the decision to fire her.

66. By the aforementioned actions, Defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of her employment due to her gender in violation of the Human Rights Law and City Law.

67. As a result of the discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

### FIFTH CAUSE OF ACTION

### Aiding and Abetting Discrimination

68. Plaintiff realleges and incorporates by reference paragraphs 1 through 67 of the Complaint as if fully set forth herein.

69. As detailed above, Plaintiff was terminated in violation of the Human Rights Law and City Law.

70. By the aforementioned actions, Defendants, separately and together, have aided and abetted discrimination against Plaintiff in the terms, conditions, and privileges of her employment in violation of the Human Rights Law and City Law.

71. As a result of the aiding and abetting engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## SIXTH CAUSE OF ACTION

### Failure to Provide Notice of Pay

72. Plaintiff realleges and incorporates by reference paragraphs 1 through 71 of the Complaint as if fully alleged herein.

73. Defendants failed to provide Plaintiff with a Notice and Acknowledgement of Pay Rate, as set forth in § 195 of the Labor Law, by using an official New York State Department of Labor form (LS 59).

74. The information provided to Plaintiff at the time of her hire, contained in an offer letter, does not meet the full requirements of the Labor Law, nor did Natuzzi provide her with a signed copy of the offer letter.

75. Defendants, by the above omissions, have violated Labor Law § 195.

76. Among other things, Defendants are subject to civil penalties for each week of non-compliance.

WHEREFORE, Plaintiff demands that judgment be entered in her favor and that the Court order and award Plaintiff the following relief against Defendants:

A. Damages in the form of (i) back pay with interest based on Plaintiff's appropriate compensation had her rights not been violated and had she not been discriminated and/or retaliated against; and (ii) front pay;

B. Compensatory damages for emotional pain and suffering, mental anguish, distress, humiliation, and loss of reputation in an amount to be determined at trial;

C. Punitive damages in an amount to be determined at trial;

D. Liquidated damages;

E. Civil Penalties;

F. Attorney's fees;

G. Costs and disbursements;

H. Interest; and

I. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff demands a trial by jury as to all issues in the above matter.

Dated: Garden City, New York
December 19, 2023

Respectfully submitted,
CARABBA LAW FIRM P.C.

By:_____
Anthony Carabba, Jr. (AC 1487)
300 Garden City Plaza, Suite 300
Garden City, New York 11530
212.430.6400; acarabba@carabbalaw.com

*Counsel for Plaintiff*